- BURN & LEVINSON, LLP  
  BOSTON, MA  
  (617) 345-3000  
  125 Summer St, Boston, MA 02110  
  • sent info 4/5  
  tell Monica to call back

- Jim  KKF@attorneys.com  
  KRASNOO KLEHM LLP  Falkner  
  ANDOVER, MA  
  (Bochart v Wayne) didn't work out too well  
  (978) 296-5173  
  28 Andover St Ste 240  
  Andover, MA 01810  
  • sent Amended info 4/5  
  sent info on 3/27 said McKe Bio: send to him

- ✗ Hedges & Tumposky  
  Boston, MA  
  (617) 722-8720  
  50 Congress St Ste 600  
  Boston, MA 02109  
  cause of guilty plea?

- Hector E. Piñeiro  
  508-770-0600  
  • sent Dave Amended info on 4/5

- ✗ Joun Law office  
  Brookline, MA  
  (Vesna Nuon v Lowell, MA)  
  no google  
  • sent Howard Friedman Amended info on 4/4

- Perry Krumsiek LLP  
  Boston, MA  
  Kamayou v UMass  
  617-720-4300

- Goodwin Procter, LLP  
  Boston, MA  
  617-570-1000

- ✗ Sinsheimer & Associates  
  Boston, MA  
  Ferraro v Kelley  
  617-722-9954  
  3/28/18  
  call end of next week  
  -Andrew

  20 West St  
  Boston, MA 02111  
  Mass Bar Lawyer Referral Service  617-654-0400  
  Greater Boston Legal Service  1-800-323-3205

Attorney/client corespondants

973-454-3322   Patrick Sheny
255 High St
Lowell

- Sasson, Turnbull & Hoose, Lead: ~~~~ Northampton, Ma
  Maria Hernandez v. Josue Colon, City of Holyoke 5/25/18

- ~~~~ Law offices of Peter Slepchuk ~~~~ ; Lead: Peter Slepchuk Jr. Springfield, Ma
  Le'Keisha Brown v City of Springfield 3/15/18

- *Pawlak & Higgins, LLC Lead: Keith Higgins Fitchburg, Ma
  Hector L. Mangual v City of Worcester 1/23/18

- Mingace & Heineman, PC, Framingham, MA
  Dyette v MCI Cedar Jun 1/23/18

- Law office of Anthony Wilson, Springfield, Ma
  ~~~~
  ~~~~

- Nicole J. Oribhabor, Oribhabor Law

~~~~

- Nugent Law Offices LLP, Boston, Ma Lead: Kevin B. Nugent
  Radcliffe Walker v Frank Femino 5/2/18

- Jeruchim & Davenport, LLP, Boston, Ma Lead: Vivianne E. Jeruchim
  Watson v David Mita

●●●●● Star Rating

211 Congress St Boston 02114  617-482-2170

American Civil Liberties Union Foundation of Massachusetts ?

X̶ Law office of Hector E. Pineiro PC Worcester, Ma  ← send info on 3/27
(excessive force Burgos-Martinez v. City of Worcester didn't make motion deadline to compel discovery Dec 18)  508-770-0600

● Law office of Sara Elizabeth Burns, Boston, Ma
(Sheffield v Pieraway 2/22/19)

● Shapiro, Weissberg & Garin LLP Boston, Ma — 617-742-5800
(Freedman v Ali 11/14/18)

X̶ Gleason Law Offices, ~~Haverhill, Ma~~  ~~978-521-4644~~
seems hungry for cases (Perne v Martinez)

● Liviz Law office Lowell, Ma

● Law office of Karen E. Goldenberg Lowell, Ma  97 Central St Suite 403 Lowell, Ma 01852  978-221-2503
call 4/10 and talk about

Pawlak & Higgins - 978-345-5132  * called on 3/27
  left message with Liem
Northampton, Ma - 413 586-4800  * Samantha called on 3/27
Jasson, Hoose
Turnbull:

* Law office of Justin Drechsler Montpelier, VT

Jeff Nathan - 617-472-5775

Lowell Police Department
JFK Civic Center • 50 Arcand Drive • Lowell, MA 01852
P: 978.674.4500 • F: 978.970.0455
www.Lowellma.gov

*Paul Aaron*
*15973-049*

*Raymond Kelly Richardson*
*Superintendent*

*Deborah Friedl*
*Deputy Superintendent*

*Barry Golner*
*Deputy Superintendent*



TO:        Superintendent Raymond Kelly Richardson

FROM:      Board of Inquiry Members
           Captain Daniel R. Larocque – President
           Captain James Hodgdon – Member
           Captain Mark LeBlanc – Member

DATE:      January 28, 2019

SUBJECT:   Internal Investigation # 2018-0211

---

On Friday October 26, 2018 Superintendent Raymond Kelly Richardson formed a Board of Inquiry consisting of Captain Daniel R. Larocque - President, Captain James Hodgdon - Member, and Captain Mark LeBlanc - Member. The Board of Inquiry (BOI) was established to investigate Internal Investigation # 2018-0211. The internal investigation was a result of the Middlesex District Attorney's Office notifying Superintendent Richardson that an issue had come to light involving members of the Lowell Police Department Special Investigations Section (SIS).

The Middlesex District Attorney's Office reported that they had received information from a defense attorney as well as members of the US Attorney's Office in Concord, NH that inconsistencies had been revealed in court related to Lowell Police Arrest Report 18-0003891A and a resulting search warrant affidavit, submitted by personnel from the Lowell Police Department Special Investigations Section, pertaining to the arrest of Paul Aaron on March 7, 2018. Due to concerns raised by the inconsistencies the Middlesex District Attorney's Office filed a nolle prosequi on October 12, 2018 for all charges stemming from Mr. Aaron's arrest on March 7, 2018.

The investigative directive of the Board of Inquiry was to:

The City of **LOWELL** *Alive. Unique. Inspiring.*

When asked if he had any other conversations with the AUSA Detective Dokos stated, "yeah when I first arrived and there was no trial prep, there was no nothing, they, she called me on, Raff actually probably like the week prior maybe I believe it was something roughly close, Detective Rivera asked me if I was going to Federal Court and I said not that I know of, and he said well they want to know if you're, you know, if you can go or whatever, I said well you know what tell them to send Sergeant Boyle a summons or don't call me. So sure enough they call Sergeant Boyle, send him a summons...".

At some point prior to court Detective Dokos received a call from the AUSA's supervisor or partner and he was asked if he remembered the case. He informed the male that he would need to review his reports of the incident. While in court he was told that the defense was calling him as a witness. He was also asked if he knew why the defense had pictures of a nail salon.

During the interview Detective Dokos stated that he was waiting in a room with Detective Kew, but it is believed he meant to say Detective Rivera. Also in the room was NHSP Trooper Vicente. He did tell the AUSA that a salon was near the area of the arrest. Trooper Vicente went in to testify first. Detective Dokos stated that he felt the trooper was gone for two to three hours. When the trooper came out of the court room he told Detective Dokos that he could not talk to him. Dokos reports texting the AUSA and inquiring how long it would be before he went in to testify; he was told the two could go to lunch. At some point Detective Dokos either got a call or received a text from the AUSA and was told they could leave. The two detectives left after lunch.

On the way to work that afternoon Detective Dokos received a call from the AUSA he believes. During the conversation the AUSA told Detective Dokos that she could not tell him what happened in the court. The AUSA went on to say that, "they saved me and Rivera's career". Detective Dokos stated, "I really don't know what you're talking about." He was informed that there was a video and Detective Dokos told the AUSA, "all I can tell you right now, I didn't lie, Rivera didn't lie, nobody in my unit lied that night." Dokos told the AUSA he did not know what they were talking about; that the incident was approximately twenty seconds long. He told her that he would testify "whenever for you". Dokos reports being confident in his affidavit and the arrest report. Dokos told the AUSA, "I was there that night you know unless there's some untruthfulness that I don't know about, I said I don't know what to tell you but I do know that I told the truth, I did not lie about anything, I don't believe Rivera did and I don't' believe anyone else in my unit would. And that's all I can speak for."

As the conversation continued Dokos was told that the "video didn't look as how the report read." Dokos told the AUSA "I wasn't there physically to see the takedown so I can't tell you what exactly happened but you know I was going off the word of someone else and, and I have no reason to believe that anyone lied." Dokos believes that due to the number of law enforcement on scene that if anything crazy happened they would all know.

When asked at some point did he become aware that where Paul Aaron had been taken into custody was not in front of 193 East Merrimack St. he said that he realized it when he spoke with the AUSA on

On Mar.7th 2018, several Lowell Police SIS officers acted in a concerted fashion and conspired with a N.H State Trooper to violate an unidentified "black male" civil rights. Affidavits and reports prove officers of Lowell, Ma and a N.H State Trooper conspired to target a "black male" similar to the one N.H State Trooper seen days prior on Mar.3rd and Mar.6th. They unlawfully arrested him, subjected him to excessive force, and falsified reports to justify arrest and future affidavits to support applications for warrants. Although no unlawful conduct was found on Mar.3rd or Mar.6th, police conspired to continue to pursue "black males" similar to my build and complexion around the area. Viewing the police reports in context, its sufficient to support a reasonable inference that officers not only gratuitously employed excessive force in arresting, but that the conspired actions were motivated by a racial animus violative of the "equal benefit" and "like punishment" clauses of section 1981(a) and 1985(3). They eventually destroyed and confiscated property when apartment was unlawfully searched on Mar.8th. On Mar.10th my vehicle was also confiscated without warrant and searched, reminisce of police K-9 dog paws and hair are still embedded in the interior of the vehicle today.

**Malicious prosecution**
I was maliciously charged without probable cause with trafficking over 200 grams of heroin as a result of the Mar.7th arrest. There is no evidence that officers applied Narc Test after false arrest on suspected "kilogram in bag" to support trafficking over 200 grams of heroin charge, lab tests would also reveal no traces of heroin. Remaining statements in police reports and affidavit in support of application for search warrant was made with malice, knowledge that it was false, and with reckless disregard for the truth. I was eventually detained by a Federal judge and subjected to a 10 year mandatory minimum and the rebuttable presumption that no conditions or combination of conditions exist that will reasonably assure the appearance of the defendant pursuant to 18 U.S.C. 3142(e). That presumption was lifted after NH State Trooper and Lowell Police SIS misconduct was exposed.

**Negligent Supervision, Failure to Train under Mass. Gen. Laws ch.258 & *Monell Claims***
Due to the inconsistencies in the reports of my Mar.7th illegal arrest, a Board of Inquiry was established in Lowell, Ma to investigate Internal Investigation #2018-02II. A debriefing of that evidence alone would show that it's a Lowell Police custom to falsify evidence and forge reports. During Sgt. Desmarais's interview with the Board of Inquiry, he clearly states that he was well aware of forging reports and claimed that "he does not see an issue with it" (Page.67 Prohibited Conduct of Sgt. Desmarais). To establish the existence of a custom that fairly represents a municipal policy, the plaintiff must point to a pattern of similar incidents in which individuals were injured by police misconduct or incompetence that was general or widespread throughout the police force. A review of historical evidence will show these accustomed practices have been ongoing and well known to supervisors well before my Mar.7th arrest (see JONATHAN SANTIAGO Civil Action No. 13-12172-IT).

**Negligent Failure to Provide Medical Assistance/Failure to Provide Adequate Medical Treatment**
**Intentional infliction of emotional distress (IIED)/Negligent infliction of emotional distress (NIED)**
After the unreasonable tactical take-down and unlawful arrest by N.H State Trooper and Lowell SIS officers I instantly began to experience R.T knee, R.T arm pain, and whiplash symptoms in my head and neck. During the booking process I complained about my injuries to the booking officer and surrounding officers until I was put in a holding cell and left alone. Moments later SIS Detective Lally and Dokos enter the cell I was located in and introduced them selves, I then plead for medical attention stating that I had severe head pains (which is stated in Dokos's Affidavit), breathing issues and felt swelling setting into my R.T knee and R.T arm. Dokos told me they would be right back and I was then left alone for the remainder of the night without any medical assistance. After I was released on Mar.8, I went back to my residence which was left in shambles after the unlawful search to retrieve I.D, bank card, and/or health insurance info in order to seek and schedule medical help. I was unable to do so because a majority of the most important of my identification material was confiscated by police, most of which is listed in the police search inventory report (Attorney Steve Barton can testify as to how apartment was left after search). Saturday Mar.10th was when my vehicle was confiscated, with no bank card, I.D, or vehicle I felt completely impaired and unable to seek the medical help I needed. I stayed bed ridden for weeks up until Apr.9th arrest, it was only after I was subjected to incarceration at Strafford County DOC, Dover NH was I able to see a doctor. Due to the Mar.7th arrest, I have seen several different physicians, x-rays, and I'm currently prescribed multiple medications to treat pain, anxiety, PTSD, and other mental symptoms.

**FACTUAL BACKGROUND:**
1) I have been employed as a hoisting engineer contractor for National Grid, and the majority of the Boston area utility companies for the past 15 years. My position as a hoisting engineer requires numerous refresher courses and classes to keep updated licenses and certifications including, but not limited to CDL Class A Driver license, 2A Massachusetts hoisting license, OSHA Hours, and other certifications that allow me to operate around underground

and overhead utility facilities. The position I retain is physically demanding, involves several hands on techniques to install and repair utility facilities, climbing at high heights, and zero tolerance for drug use. I also exercised daily to stay in shape and to be able to bear the burdens of the hard labor aspects of my career. Working in the street and around the public while utility facilities are exposed is a public safety hazard, so in order to start a task, us contractors must employ local police officers that stay on detail through out the day until the job is complete. My relationship with law enforcement was much respected and admired by my co workers as well as the officers I worked with. I considered the local officers I worked with as co-workers in not only Lowell, but every city I was stationed to work in. I was very socially connected with the officers I worked with. We took turns buying lunch and eating together, shared conversations about our personal lives during break, and kept each other safe throughout the workday. I worked with many police officers throughout my career as a hoisting engineer contractor and many of them know me personally because of my positive attitude and work habits. Before my arrest on Mar.7$^{th}$ every encounter I've had with police, even outside of work hours has been non-aggressive and straight forward. Excluding my Mar.7$^{th}$ arrest, I've been properly arrested without any incident a total of four times in my life; one of which resulted in a misdemeanor conviction as a juvenile in 2003 and one misdemeanor conviction as an adult in 2005.

2) Due to the egregiousness of the Mar.7$^{th}$ arrest, falsified affidavits, and publicity of the Lowell Police corruption, I've now been humiliated, developed a lack of trust, and a fear of retaliation from law enforcement. None of my co defendants had to endure as much publicity that I had during this case. My face and name has been aired on numerous news stations and tabloids and the story has been primarily based on the egregious misconduct of the City of Lowell's Police Department. I've been made the "Poster Boy" for Lowell Police and N.H State Trooper's misconduct exposure and I as well as attorney Steve Barton feels that it has angered a lot of people. I'm also concerned about my family that live and work around the City of Lowell as well. Attorney Steve Barton and Public Defender Julie Olsen has had to alter their lives also as a result of this case. I now suffer from difficulties in maintaining social functioning, depressive syndrome, nightmares, sleepless nights, anxiety, PTSD symptoms, stomach pains, restrictions of activities of daily living like my regular daily exercise and other problems I never had prior to the Mar.7$^{th}$ unlawful arrest, which I now currently take multiple medications for prescribed by a licensed psychiatrist. Also as a result of being subjected to excessive force, I now take pain medication for RT. knee, RT. arm, head, neck, back, severe migraines, and had x-rays where RT. knee and RT. arm swelling was located.

3) I'm usually stationed in Lowell, Ma and surrounding areas to work, but because of the Mar.7$^{th}$ unlawful arrest I will have to find a new job that prohibits me from working with local PD in that area due to the fear of retaliation, the humiliation, and emotional distress I'm currently enduring. Physically I will have to find a new position or even a whole new career as a result of the injuries sustained from the illegal arrest on Mar.7$^{th}$. My state attorney Steve Barton has experiences with the Lowell Police and also opined and suggested that I relocate my job and residence away from the area of Lowell out of fear that the Lowell Police would retaliate.

4) I'm also an avid day trader that has various stock holdings and accounts dating back to 2013. Being a day trader requires me to review stock market on a minute to minute basis, attend seminars,and take numerous notes on public companies. I had several notes and accounts stored on my cell phone that was unlawfully confiscated on Mar.7$^{th}$ and additional material on tablet and cell phones unlawfully confiscated on Mar.8$^{th}$. Because of the illegal actions of the Lowell Police SIS, I lost several chances to gain funds, complete share orders, and further my education in day trading. On Apr.9$^{th}$ I was federally arrested, eventually detained by a Federal judge, and subjected to a 10 year mandatory minimum and the rebuttable presumption that no conditions or combination of conditions exist that will reasonably assure the appearance of the defendant pursuant to 18 U.S.C. 3142(e). More than 8 months later, that rebuttable presumption was lifted soon after NH State Trooper and Lowell Police SIS misconduct was exposed. By then, my career as a day trader took an irreversible loss and I was unable to recover the lost gains as a result of the police misconduct. To racially profile someone, assault and batter, and arrest that person without probable cause is so outrageous in character and so extreme a degree, it goes beyond all possible bounds of decency. To then after arrest forge reports and perjure affidavits to justify arrest while in all acting under the color of law, should be regarded as atrocious and utterly intolerable in a civilized community.

5) I work side jobs with my father as well doing weekly general maintenance at a chain of Dunkin Donuts stores, 7-Eleven stores, and other variety stores around Lowell. Just like my primary job as a hoisting engineer, it is a physically demanding job that includes climbing at high heights, heavy lifting, and operating small machinery (pressure washers, lawn mowers, etc.). It's a very social atmosphere and being comfortable in those types of setting is also a requirement. But due to the reasons mentioned above, its going to be very hard for not only me, but my father Paul Aaron Sr. to continue these jobs without having the above mentioned emotional distress symptoms, the sense of humiliation, and the fear of retaliation by the Lowell Police. My father suffered loss of consortium, services, and society as a result of the Lowell Police misconduct. He depended on me to drop him of at his dialysis appointments and pick him up after appointments were finished. He was wheelchair bound at the time of my vehicle

purchase, so I bought a vehicle with enough space to amend to his needs. After appointments he did not have the strength to walk so I would have to us the wheelchair to bring him to my vehicle, physically carry him into the passenger seat, and placed wheelchair in back of my vehicle. I also went to stores, retrieved prescriptions, and happily performed multiple tasks for my father prior to the Mar.7th. Lowell Police SIS misconduct. After the Lowell Police misconduct, both me and my father could not completely adjust to the circumstances. My father would testify about changes that resulted from the physical and emotional injuries suffered by his son, including that we both have anxiety about going out in public, difficulty sleeping, anxiety, exhibits excessive traits, cries, cannot relax and carry on a conversation or tolerate noise. This results in hardship to my father up to the present date and will continue in the future. Before the Mar.7th incident me and my father had an unbreakable bond, but things have taken a turn for the worst now and since the Lowell Police SIS misconduct.

**Legal Analysis:**
**Unlawful Arrest ( Search and Seizure ) & Excessive force (Assault & Battery):**

6) Any force that law enforcement officers apply in order to effect a seizure is, by definition, excessive if the seizure is unlawful. A police officer violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not "objectively reasonable" in light of the facts and circumstances confronting [him].

7) The law with regard to the unlawful arrest is also clear. "Generally, a warrant less arrest is constitutionally valid when an officer has probable cause to believe that the arrestee committed a crime."

8) An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.
(United States v. Camacho 1st App) Nov. 23, 2011 Case No. 09-2415

9) There is no reasonable suspicion let alone probable cause to excessively arrest an unidentified "black male" having a brief interaction with an unidentified "taxi livery" van on a public street.

10) For a plain-clothed officer to not identify himself before preforming a tactical police take-down during a false arrest without any form of resistance from arrestee is egregious at the very least.

11) In a civil proceeding, In Limine motion should render any evidence obtained AFTER unlawful arrest inadmissible during a trial. Whether plaintiff had bulletproof vest or drugs in bag after the fact of an unlawful arrest should be irrelevant to whether there was probable cause to arrest or if force used was reasonable from the beginning, although evidence may be admissible while testing probable cause analysis for search warrant of apartment.

12) Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons Relevant evidence may be excluded if it is substantially outweighed by prejudice, delay, confusion, or repetition.

13) An "objective reasonableness under the circumstances" standard applies to Fourth Amendment, U.S. Const. amend. IV, excessive force and arrest claims. "Under the circumstances" refers only to the circumstances known and information available to the officer at the time of his action. Knowledge of facts and circumstances gained after the fact has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. (Sherrod v. Berry 7th App) Aug. 22, 1988 Case No. 85-3151

14) There is a difference between being falsely arrested on one occasion and being rightfully arrested (and rightfully convicted) on another occasion. It is possible for a person to be traumatized by being falsely hauled off to jail and incarcerated, while accepting responsibility for his other misdeeds that result in even longer, lawful incarceration. That is, a person may suffer emotional distress from being falsely arrested and held for mere hours while suffering no or minimal emotional distress (or emotional distress of a different kind) after being rightfully arrested, convicted, and incarcerate
(Barber v. City of Chicago 7th App) Feb. 11, 2013 Case No. 12-2562

**Unlawful Search and Malicious Prosecution:**

15) At common law, a claim for malicious prosecution will lie when a person with malice and without probable cause procures the issuance of a search warrant.
(Abrahamson v. Berkley 9th Cir) Sep. 2, 2016 Case No. 1:16-CV-0348 AWI BAM

16) If the charges are dismissed before trial, a presumption arises that the defendant acted both without probable cause and with malice. In such cases the burden shifts to the defendant to prove the presence of probable cause and the lack of malice. (See Ballard v. Mook, 550 So. 2d 1208, 1212 La. App. 4 Cir. 1989).

17) If the district court determines that the plaintiffs action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed,

in the absence of some other bar to the suit.(Heck v. Humphrey Sup.) June 24, 1994 Case No. 512 US 477

18) "A plaintiff claiming malicious prosecution must be innocent of the crime charged in the underlying prosecution." "Even if the plaintiff in malicious prosecution can show that the defendant acted maliciously and without probable cause in instituting a prosecution, it is always open to the defendant to escape liability by showing in the malicious prosecution suit itself that the plaintiff was in fact guilty of the offense with which he was charged."
(Hector v. Gordon 3rd App) Dec. 13, 2000 Case No. 00-3084

19) Although plead guilty in NH Federal Court to a lesser count than the one initially charged with, and to offense conduct relating to Mar.1 and Mar.10, all Massachusetts charges related to Mar.7 arrest were held inadmissible during NH Federal trial and Massachusetts Middlesex District Attorney's Office decided not to prosecute "in the interest of justice".

20) A police officer's move to dismiss plaintiff's 42 U.S.C.S. 1983 claim was denied. If defendant's actions in the period leading up to plaintiff's overturned conviction proximately caused plaintiff's conviction and incarceration, the court could not ignore injuries plaintiff allegedly suffered during his imprisonment merely because he had been set free. (Carter v. Georgevich) Jan. 5, 2000  Civ. A. No. 96-1990(WHW)

**CITED CASES:**

**McElwain v. Harris**     April 18, 2006, Decided
1st Cir. CASE NO. 1:05-CV-93-JAW
Prison garb could have prejudiced the jury and undermined the right to a fair trial on damages. Moreover, the court had excluded defendant's guilty plea and conviction for negligent homicide and any evidence of her intoxication. Her daily appearance in prison attire would inevitably have led the jury to speculate why she was in jail and would have been an ever-present reminder of her incarceration. The likelihood of substantial prejudice was manifest, and the court would not allow the jury to receive by indirection that which it was not able to receive directly.

**Bordanaro v. McLeod**     March 30, 1989
1st Cir. CASE NO. 88-1563
Courts have established two requirements for plaintiffs to meet in maintaining an action grounded upon an unconstitutional municipal custom. First, the custom or practice must be attributable to the municipality.

**Mines v. City of Philadelphia**     February 22, 1995, Decided
3rd Cir. CASE NO. 93-3052
The court held that the admission of evidence that the decedent was unarmed after the fact was improper, irrelevant, and highly prejudicial and that it infected the proceedings so as to require a new trial in the interest of justice. The jury could not have knowledge of facts and circumstances that were unknown to the officer at the time he made the crucial decision to shoot the decedent.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

```
***************************
*                         *
*  United States of America  *
*                         *
*         v.              *    Case No.: 18-cr-33-25-JL
*                         *
*       Paul Aaron        *
*                         *
***************************
```

## MOTION TO SUPPRESS II

**NOW COMES** the defendant, Paul Aaron, by counsel, David H. Bownes, Esq. and respectfully requests that this Court Suppress as "Fruits of the Poisonous Tree," the following:

    A. Any identifying information as to this defendant, Paul Aaron, and the fruits thereof;

    B. Any evidence gained by the unlawful seizure of his cell phone on March 7, 2018 including that information identifying Mr. Aaron as the owner of the phone and the cell phone number;

    C. Any evidence seized as a result of the execution of the Search Warrant on March 8, 2018 and the fruits thereof;

    D. Any evidence seized as a result of the execution of the Search Warrant on or about April 9, 2018, including, but not limited to the following:

        1. The phone seized as a result of the execution of that warrant and the fruits thereof.

As grounds for this request it is stated:

    I. **FACTUAL OVERVIEW**

        a. **The March 7th and March 8th Events**

1. As a result of the original Suppression Hearing held on or about October 9, 2018, the Government conceded the following:

   A. The unlawfulness of the defendant's arrest on March 7, 2018;

   B. The unlawfulness of the Search Warrant executed at 193 E. Merrimack Street the following day as the result of the defendant's unlawful arrest.

2. Up and until the defendant's actual arrest on March 7, 2018, law enforcement had been unable to identify the defendant by name or any other means apart from a telephone number from an unknown source.

3. As a result of the arrest of the defendant, certain items were seized, including, but not limited to, a cell phone.

4. After seizing the cell phone, law enforcement then identified the owner as Paul Aaron and identified the cell phone number as belonging to Paul Aaron.

5. In particular, they identified Paul Aaron's phone as (978) 398-4561.

6. Relying on the unlawfully seized cell phone and cell phone number, and through telephone intercepts, the Government then identified Paul Aaron as the individual who was having contact with one of the intercepted cell phones.

7. Those have been identified in discovery as coming from Paul Aaron.

8. Moreover, it is apparent that soon after Mr. Aaron's arrest on March 7, 2018, law enforcement engaged collectively in an effort to fabricate the circumstances of Mr. Aaron's arrest.

9. As is apparent from the testimony of Trooper Vincente, during the course of the Hearing on the Motion to Suppress, Trooper Vincente testified falsely to the following:

   A. On March 7, 2018 he had set up surveillance along East Merrimack Street, and that while he was in his van, he observed Mr. Aaron walking on the opposite side of East Merrimack Street (that is the area opposite the markets and shops along East Merrimack Street).

B. At the time he observed Mr. Aaron walking, he was walking without a bag in his hand. (According to Trooper Vincente's direct examination, this was critical information that led to a reasonable suspicion that criminal activity was afoot).

C. While engaged in that surveillance, he observed Mr. Aaron approach a cab and lean inside and reappear.

D. At the time he reappeared, he was now carrying a bag.

E. At that point in time, he made a decision to approach Mr. Aaron.

F. During that approach, Mr. Aaron turned away and attempted to avoid contact with law enforcement.

G. More particularly, he described a struggle that occurred between himself and Mr. Aaron.

10. Trooper Vincente's testimony was in most respects consistent with the police reports authored by Detective Rafael Rivera (See Exhibit A, presented during the Hearing on the Motion to Suppress).

11. In addition, those events as described by Trooper Vincente on direct were then replicated by Detective Dokos in his Application for Search Warrant of 193 East Merrimack Street executed on March 8, 2018. (See Exhibit C, at the Hearing on Motion to Suppress).

12. It is apparent from the video submitted and from the photographs submitted of the area that the events surrounding Mr. Aaron's arrest on March 7, 2018 were decidedly different than the testimony concocted by law enforcement in order to justify Mr. Aaron's arrest.

# Bureau of Prisons
# Psychology Services
# Intake Screening

**SENSITIVE BUT UNCLASSIFIED**

| | | |
|---|---|---|
| Inmate Name: AARON, PAUL | | Reg #: 15973-049 |
| Date of Birth: 01/03/1987 | Sex: M   Facility: BRO | Unit Team: H |
| Date: 07/30/2019 13:54 | Provider: Huber, Brent PsyD | |

### Limits of Confidentiality
Limits of confidentiality were reviewed with inmate AARON. He expressed an understanding of the limits of confidentiality and consented to be interviewed accordingly.

### Data Source(s)
The following data sources were reviewed in conjunction with this Initial Intake Evaluation: Self-Report, SENTRY.

### Mental Health History and Current Symptoms
A history of mental health issues was noted: Anxiety Disorder, Trauma / Stressor Related Disorder.

Mr. AARON reported he was diagnosed with an anxiety disorder and PTSD following his arrest on 3/7/2018. He stated the police used excessive force while apprehending him, causing him physical and mental distress. Mr. AARON reported experiencing anxiety, nightmares, and social problems since that time. Regarding the social problems, Mr. AARON explained he has become withdrawn and has difficulty trusting others, and particularly is nervous around correctional officers.

Mr. AARON denied any history of mental illness prior to this event.

A history of prior mental health treatment was noted: Psychotropic Medications, Other.

Mr. AARON reported he was prescribed Remeron and an antidepressant following his arrest. He stated he was unable to recall the names of the antidepressant medications. A review of BEMR indicates Mr. AARON is currently prescribed Remeron, Zoloft, and Cymbalta. He also stated he was prescribed Gabapentin in the past.

Mr. AARON reported receiving individual therapy while incarcerated once every three months following his arrest. He denied any other history of mental health treatment.

Current mental health symptoms were noted: Depression, Anxiety.

Mr. AARON endorsed on his PSIQ "sad, tearful, depressed," "tense, nervous, anxious," and "feeling hopeless about life." Mr. AARON reported these feelings were related to his traumatic experience while being arrested.

No suicidal ideation, attempts, or self-harm were noted.

### Substance Abuse
A history of substance abuse was noted: Alcohol, Marijuana, Cocaine/Crack, Heroin/Opiates, Amphetamines, Ecstacy/Club Drugs, Hallucinogens, Prescription Drugs.

Mr. AARON reported first using alcohol at the age of 15, and most recently in March, 2018. He stated he used alcohol daily for periods of time. Mr. AARON reported first using opiates (Fentanyl) in 2001, and most recently in March, 2018. He stated he used Fentanyl daily at times in the past. Mr. AARON reported he first used PCP at the age of 15, and relate he tried the substance "a few times" at that age. Mr. AARON reported he first used amphetamines at the age of 15, and most recently in March, 2018. He stated his period of most frequent amphetamine use consisted of using the substance around two times per week. Mr. AARON reported using inhalants one time at the age of 15, at which time he stated he inhaled the contents of an aerosol can. Mr. AARON reported abusing Xanax weekly between the ages of 15 and 18. Mr. AARON stated he first used cocaine at the age of 15, and most recently in March, 2018. He stated he used cocaine daily at times in the past. Mr. AARON reported using mushrooms monthly between the ages of 16 and 18. Mr. AARON reported first using ecstasy at the age of 15 and most recently at the age of 25. He stated he would use the substance monthly in the past. Mr. AARON reported first using marijuana at the age of 15, and most recently in March, 2018. He stated he used marijuana daily in the past.

A history of substance abuse treatment was noted: AA/NA/Self-Help, Other.

Mr. AARON reported participating in NA meetings while incarcerated at a state facility. He stated he also attended "MRT" drug treatment meetings while incarcerated at a state facility, though noted he did not complete the program because he was transferred.

### Sex Offenses
No sexual offense convictions were noted.

No history of sexual predation in a correctional setting was noted.

### Relevant Psychosocial History
Noteworthy psychosocial issues: Other Relevant Sexual History.

Inmate denied history of sexual victimization in the community or while incarcerated.

### Adjustment to Incarceration

Generated 08/01/2019 12:53 by Ortega, C. PhD/Chief         Bureau of Prisons - BRO         Page 1 of 2

| | | | |
|---|---|---|---|
| Inmate Name: AARON, PAUL | | Reg #: 15973-049 | |
| Date of Birth: 01/03/1987 | Sex: M   Facility: BRO | Unit Team: H | |
| Date: 07/30/2019 13:54 | Provider: Huber, Brent PsyD | | |

Adjustment to incarceration concerns were identified: Other.

Mr. AARON reported having difficulty trusting correctional officers after his traumatic experience while being arrested. He did not specify any specific issues with staff while at BRO, and indicated it was more of a general distrust.

**Findings**

Care Level:   CARE2-MH

Mr. AARON reported mental health symptoms resulting in impairment in his ability to function, including the ability to interact with peers and correctional staff. This impairment is such that it can be managed effectively with routine outpatient treatment, indicating Mr. AARON is best categorized as a CARE2-MH. This care level may be revisited at any time as needed.

**Recommendations**

The following psychological services are recommended: Follow-Up Appointment.

Per his mental health care level, Mr. AARON will be seen at least monthly. Mr. AARON was informed how to contact psychology in the interim.

Completed by Huber, Brent PsyD on 07/31/2019 14:44

Reviewed by Ortega, C. PhD/Chief Psychologist on 08/01/2019 12:53